MARC E. JOHNSON, Judge.
| ¡¡Defendant, Quentin McClure, appeals his convictions and sentences for second degree murder, possession of a firearm by a convicted felon, attempted possession of a firearm by a convicted felon, intimidation of a witness, and conspiracy to commit obstruction of justice, raising several issues including sufficiency of the evidence, denial of his challenges for cause during jury selection, admissibility of an officer’s testimony on expert matters, and admissibility of hearsay testimony of a deceased witness. For the reasons that follow, we affirm Defendant’s convictions and sentences, except his sentence for attempted possession of a firearm by a convicted felon which we vacate and remand for resentencing.
Defendant McClure, along with his co-defendants Chasity Griffin and Jeffery Nelson, were charged in an eight-count indictment on February 2, 2012|swith various crimes relating to the murders of Theodore Pierce and eyewitness Charles Smith. McClure was charged with the January 2,2011 second degree murder of Pierce, in violation of La. R.S. 14:30.1 (count one); two counts of possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1 (counts three and four); intimidation of a witness, in violation of La. R.S. 14:129.1 (count seven); and conspiracy to commit obstruction of justice, in violation of La. R.S. 14:26 and 14:130.1(A)(2) and/or (A)(3) (count eight).[1] Defendant pled not guilty and filed several pre-trial *515 motions, including motions to suppress evidence, identification and statements, which were denied after a hearing.
Defendant, and his two co-defendants, proceeded to trial on August 5, 2013 before a twelve-person jury. After an eight-day trial, the jury returned a verdict of guilty as charged against Defendant on all counts, except for count four, which the jury found Defendant guilty of the responsive verdict of attempted possession of a firearm by a convicted felon.[2] The trial court subsequently sentenced Defendant to concurrent sentences of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on count one (second degree murder); 20 years at hard labor without benefit of probation, parole, or suspension of sentence on count three (felon in possession of a firearm); 10 years at hard labor without benefit of probation, parole, or suspension of sentence on count four (attempted felon in possession of a firearm); 20 years at hard labor on count seven (intimidation of a witness); and 30 years at hard labor on count eight (conspiracy to commit obstruction of justice).
| ¿FACTS
In summary, Theodore Pierce was murdered outside of a friend’s house in Bridge City on January 2, 2011. Defendant and co-defendant Griffin were arrested shortly thereafter and charged with his murder. Pierce’s murder was witnessed by Charles Smith, a neighbor. On August 17, 2011, Smith was found shot to death in front of his home located at 231 Fourth Street in Bridge City. It was alleged that Defendant and Griffin conspired with co-defendant Nelson, who is Defendant’s younger brother, to murder Smith.

The Murder of Theodore Pierce

At approximately 4:41 p.m. on January 2, 2011, Detective Travis Eserman with the Jefferson Parish Sheriffs Office (JPSO) responded to the scene of a homicide located at 235 Fourth St. in Bridge City involving a victim by the name of Theodore Pierce.[3] Upon his arrival, Det. Eserman observed Pierce’s body in the driveway on the passenger side of a pickup truck. Pierce died on the scene. An autopsy revealed that Pierce died of multiple gunshot wounds to his face, neck and back. Fifteen spent casings were recovered at the scene. Two experts in firearm and toolmark examination, Jene Rauch and Colonel Timothy Scanlan, analyzed the ballistics material recovered from the scene and opined four guns — two .40 caliber pistols and two 9 mm pistols — were used at the scene. Colonel Scanlan, who was also qualified as an expert in crime scene reconstruction, opined there were four shooters shooting at one person from separate locations. The murder weapons were never recovered.
During the investigation, police received an anonymous tip identifying four people, including Defendant and Griffin, as being involved in the shooting. While canvassing the neighborhood for witnesses, police interviewed Charles Smith who | Jived next door to the murder scene. Smith stated that he witnessed the shooting of Pierce, whom he described as a childhood friend, and subsequently identified Defendant and Griffin in photographic lineups as two of *516 the individuals involved in the shooting.[4] In a taped statement, Smith explained that he witnessed Defendant and Griffin, who he occasionally saw walking around the neighborhood, shoot at Pierce while they were standing in front of a neighbor’s house located at 301 Fourth St.[5] Smith stated that the duo were initially standing in the street and then made their way into the yard while they shot at Pierce. He then observed Defendant approach Pierce and “finish him off.” Smith further stated that he saw a second male on the scene at the time of the shooting but did not see his face or notice whether he had a gun. Smith confirmed that Pierce did not have a gun and was not shooting back at Defendant or Griffin.
Smith also told police during his statement that the day after the shooting, Defendant drove to his house armed with a gun and confronted him stating, “I heard you talking about, about the, the shooting,” to which Smith responded that he had not been talking about anything. Smith stated that he believed his life was in danger because he had witnessed the murder.
After Smith’s statement and identifications, arrest warrants were prepared for Defendant and Griffin. Defendant was subsequently arrested a few blocks from the shooting at his residence located at 313 Lafitte St. A .38 caliber revolver was seized from his residence; however, testing revealed that it was not used in connection with Pierce’s murder. After his arrest and after being advised of his Miranda[6] rights, Defendant gave a taped statement to police explaining that he was Rhome watching the Saints football game on the day of the murder. He stated that after the football game, around 3:00 or 4:00 p.m., he went to his girlfriend, Jocelyn Scott’s, house in Kenner. When asked why someone would want to implicate him in Pierce’s murder, Defendant stated that his friend, Reginald Lewis, had been murdered in the same neighborhood in July 2010, and that it was suspected that Pierce killed Lewis.[7]
[8]
Several days later, Griffin was arrested at her sister’s home in St. Rose.[9] She likewise provided a taped statement to police after her arrest and after being advised of her rights. In her statement, Griffin stated she had been with an acquaintance named “Christy” in Algiers at the time of the murder. She indicated that she had met Christy the night before the murder at a nightclub, had entered Christy’s phone number into her phone, and had exchanged text messages with Christy on the day of the murder. However, there was no phone number for or text messages to or from Christy found on *517 Griffin’s phone, and police were unable to confirm Christy’s existence.
Records for Defendant’s and Griffin’s cell phones showed that they were both in the area of Pierce’s murder at the time he was shot and they left the area minutes after his murder. The cell phone records further indicated that Defendant and Griffin exchanged phone calls in the minutes leading up to Pierce’s murder and then again four or five hours after the murder.[10]
|7At trial, Defendant presented testimony from his sister, Lekisha Nelson, and Nelson’s girlfriend, Oraneisha Brown, who stated that Defendant was home with them at 313 Lafitte St. watching the Saints game at the time Pierce was killed. Both testified that they learned of Pierce’s murder when Nelson’s cousin came to the house around 4:30 p.m. and told them someone had been killed, and that Defendant was among the people who had gathered outside in front of their house.
Griffin testified in her defense and testified that she was with a female acquaintance at the time of Pierce’s murder. Griffin explained that she had given her cell phone to her brother prior to going to the acquaintance’s house. She stated that upon news of Pierce’s death, the female acquaintance dropped her off in Bridge City. Griffin explained that her brother, who had her cell phone, went to St. Rose immediately after the killing. She denied any involvement in Pierce’s murder.

The Murder of Charles Smith

At approximately noon on August 17, 2011, the day before a scheduled motion hearing to determine the admissibility of the photographic identifications made by Smith of Defendant and Griffin as the shooters in Pierce’s murder, Charles Smith, the lone eyewitness, was murdered in front of his home.[11] Eight casings were found at the scene and Ms. Rauch, the firearm and tool mark examiner expert, opined that only one gun was used in the shooting. An autopsy revealed Smith died of multiple gunshot wounds to his head, chest and leg. The murder weapon was never recovered.
Colonel Scanlan testified that the evidence was consistent with a “targeted action,” meaning one mobile shooter started shooting from the rear of the residence | sin a place of cover and then moved forward down the fence line. He opined the evidence was consistent with someone who was waiting to attack Smith when he came out of his home.
Defendant’s brother, Jeffery Nelson, was subsequently arrested and charged with Smith’s murder.
Evidence of a Conspiracy ■
During his investigation of Smith’s murder, Detective Matthew Vasquez with the JPSO listened to “hundreds of hours” of jailhouse phone calls made by Defendant and Griffin from the Jefferson Parish Correctional Center (JPCC) both before and *518 after Smith’s murder.[12] Det. Vasquez explained that while neither Defendant, Griffin nor Nelson admitted killing Smith in any of these phone calls, he identified several phone calls that he deemed significant. He had those calls transcribed and excerpts were played for the jury, beginning with a phone call on January 6, 2011, a few days after Pierce’s murder. During the playing of these phone calls for the jury, Det. Vasquez offered testimony as to who was talking and the meaning of the “code” language being used.
In the January 6, 2011 phone call from Defendant to an unknown male, Defendant stated that he’s “good” as “[l]ong as the n*gg* don’t say nothing.” On the next day, Defendant assured his mother that everything was alright “long as nobody don’t say nothing.” In a call to his brother, Frank, two days later, Defendant indicated that the police claimed they had one witness and “n*gg* already know who the witness is.”
On January 25, 2011, Defendant and an unknown female facilitated a three-way call with Nelson during which Defendant stated, “I ain’t trippin’ ... They don’t got no witness ... Well, they got one witness, but ... he ain’t coming to | Bcourt or whatever, woo di woo.” Two days later, Nelson asked Defendant how he got caught to which Defendant responded, “I was acting stupid ... I was acting dumb as a mother-f* *ker son ... I was on the wrong level son.”[13]
Four days later, on January 29, 2011, Defendant had another three-way call with his friend, Willis Stevenson, and Nelson. During the call, Stevenson told Defendant that Griffin had not been to court and that Griffin’s attorney said she would be going home in 120 days because the State did not have any evidence. Defendant responded, “Right, yeah cause my lawyer was like ‘uh you know they got one witness but uh your little brother is on that.’ When he told me that, I already know what it was (laughing ), ya heard me?” Stevenson then told Defendant about a conversation Griffin’s father, Terrence Daniels, had with Smith. Specifically, Stevenson said, “T went over there today, cause he was with Scooby ya know what I’m saying. So boy Scooby brought him, n*gg* was at the Fishhook. Ya know what I’m saying, he brought him to the Fishhook, I guess that where he felt comfortable at or whatever.” Later at trial, Smith’s girlfriend, Margie McKeel, testified about an incident where Smith had told her that Griffin’s father had threatened his life, telling Smith that “he better not testify or else there’s going to be gunplay.”
A few months later, on June 2, 2011, Griffin called an unknown female and told her that her attorney was going to set Griffin’s next court date for June 23, 2011 but that Griffin told her attorney the date was “too early.” Griffin explained that they needed to get their discovery packets. She stated that Defendant “was hollering about ... other lil dude whose name starts *519 with a C, ya heard me. You |inknow who I’m talking about.... I think it’s Troy’s brother, lives on Fourth Street. I ain’t gonna say his name.”[14] Later on the same day, Griffin made a call to an unknown male and told him that “they only got one witness,” who she' identified as “Chariest,] Troy’s brother.” She further stated that his statement did not add up and that “he really didn’t like see nothing.”
Two days later on June 4, 2011, Griffin spoke to a man named Louis Wells and told him to contact Smith’s girlfriend, McKeel, to see what was “happening with Dude” who was “speaking on me and Q-sie [Defendant].” Wells responded that he heard McKeel was staying in Algiers and that he had not seen her “back here.” Wells then handed the phone to Griffin’s brother. Griffin told her brother, “I need that boy, ya heard me?”
During another conversation between Griffin and her brother on June 8, 2011, her brother stated, “heard we pulling something off’ and that “Lil Jeff [Nelson]” is “all in.” Griffin later told her brother to acquire a “b*tch,” which was interpreted by Det. Vasquez to be slang for an untraceable firearm.[15] She then stated, “if you go f* *k with Dude or whatever— whatever man, you could do your own thing or whatever. You could take everything from there, ya heard me?” to which her brother responded, “[s]h*t gonna be lovely when you come home, son.”
The next day on June 9, 2011, Defendant spoke to Nelson. When Nelson asked Defendant whether “Dude” was going to testify, Defendant responded “[n]ine out of ten, he ain’t going to f*ck with that.” He further informed Nelson l^that Griffin told him that they did not know where “Dude” was and “that’s going to work out in my favor.”
One month later, on July 8, 2011, Defendant spoke to his mother who told him that the discovery packet provided by the State identified Smith as a witness. Defendant’s mother told him that his next court date was set for August 18, 2011. Three days before Smith’s murder, on August 14, 2011, Defendant told his friend Stevenson that he received his “paperwork” and that “Dude” was the only person who said something and he was the only reason he was being held. Stevenson then talked to Defendant about having spoken to Griffin.
Six hours after Smith was murdered on August 17, 2011, Defendant called Nelson and asked him whether he had heard the news about Smith and inquired as to whether it was true. Nelson answered, “[y]eah,” to which Defendant responded “[w]ell, that’s good.” Nelson then told Defendant that their mother did not want him talking to Defendant because the call could be traced “[s]inee that sh*t happened].” Defendant responded, “[f|* *k it I ain’t going to call at all ... F* *k everybody, I ain’t worried about it. I’ll be home soon.” The next day, Griffin called an unknown male and told him that she was going to be released from jail. She stated, “Oh yeah, that b*tch come from court, I didn’t go *520 though, but uh, they had slammed that Dude, you heard me? .. They had slammed that boy.” The unknown male responded, “Oh, I had heard about that sh*t.”

ISSUES

Defendant raises four issues on appeal: (1) the sufficiency of the evidence as to his second degree murder, witness intimidation and conspiracy to commit obstruction of justice convictions; (2) the denial of challenges for cause as to four prospective jurors; (3) the admission of Det. Vasquez’s testimony interpreting the | ^jailhouse phone calls of Defendant and Griffin on the basis he was not qualified as an expert; and (4) the admission of Smith’s statement to police as hearsay.

DISCUSSION

Sufficiency of the Evidence 
[16]

Defendant challenges the sufficiency of the evidence as it relates to his convictions for second degree murder and conspiracy to commit obstruction of justice.[17] With respect to Defendant’s second degree murder conviction, Defendant calls into question Smith’s credibility as to his identification of Defendant as one of the shooters. He also maintains that two defense witnesses presented an alibi as to his whereabouts at the time of Pierce’s murder. As to the conspiracy to obstruct justice conviction, Defendant argues that the State’s only proof was the hearsay statement of Smith and Det. Vasquez’s interpretation of the word “b*tch” to mean an untraceable firearm. Defendant claims that without Det. Vasquez’s “faulty assumptions” concerning the jailhouse phone conversations, the State presented “scant evidence” that Defendant had any involvement with the planning and execution of Smith’s murder.
The standard of review for determining the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [ -isbeyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Both direct and eir- *521 cumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La.App. 5 Cir. 2/26/02); 811 So.2d 1015, 1019.
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Kempton, 01-572 (La.App. 5 Cir. 12/12/01); 806 So.2d 718, 722. The rule as to circumstantial evidence is “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”' La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83.
Under the Jackson standard, a review of a criminal conviction record for sufficiency of evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt, but rather whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt after viewing the evidence in the light most favorable to the prosecution. State v. Flores, 10-651 (La.App. 5 Cir. 5/24/11); 66 So.3d 1118,1122.

Second Degree Murder

Defendant first challenges the sufficiency of the evidence for his second degree murder conviction. Defendant was prosecuted under La. R.S. 14:30.1(A)(1), which defines second degree murder as the killing of a human being |uwhen the offender has a specific intent to kill or to inflict great bodily harm. Defendant does not claim that the State failed to prove any of the essential statutory elements of the offense, but rather challenges his identification as the perpetrator of the crime; claiming that the only eyewitness was not credible because he was a “heavy drinker” and gave inconsistent statements to the police and the grand jury. Defendant further relies on his alibi witnesses who testified he was watching the Saints game with them when Pierce was shot.
When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Cowart, 01-1178 (La.App. 5 Cir. 3/26/02); 815 So.2d 275, 283, writ denied, 02-1457 (La.5/9/03); 843 So.2d 387.' Positive identification by only one witness is sufficient to support a conviction. Id.
Smith, who was the sole eyewitness to Pierce’s murder, lived next door to where Pierce was killed. He gave a statement to the police two days after the murder. In his statement, Smith stated he was returning to his house from the store when he saw three people, two guys and a girl, shooting at Pierce. Smith identified two of the three shooters, including Defendant, in a photographic lineup. Smith did not know the shooters’ names, but knew them socially from around the neighborhood. Smith stated that Defendant was wearing blue jeans and a white shirt at the time of the shooting and had a black gun. Smith was 100% sure in his identification of Defendant and noted that he had seen Defendant’s face at the time of the shooting. When questioned about the second male shooter, Smith stated that he never saw *522 his face, but described him as a black male wearing blue jeans and a black shirt.
Smith further explained that the perpetrators were initially shooting from the street and then went into the yard. He stated that Defendant “[w]ent to the fence” |1fiand “[fjinished [Pierce] off,” explaining that Defendant went closer and closer to Pierce and kept shooting until Pierce was dead. Smith stated that Defendant then ran away.
Defendant argues Smith was not credible because he was known to be a “heavy drinker,” suggesting he was drunk at the time of the shooting, and his statement to the police was inconsistent with his grand jury testimony. Defendant claims there was' conflicting information as to where Smith’s neighbor, Keith Porter, was at the time of the shooting. Smith stated Mr. Porter was outside, while Mr. Porter claimed he was inside.[18] He also maintains there was conflicting information as to whether Smith was inside his friend’s truck at the time of the shooting or was walking home. He further contends Smith was inconsistent in his testimony to the grand jury regarding the number of shooters and who he saw shooting.
Smith’s statement to the police was played for the jury and his grand jury testimony was read to the jury. Through Defendant’s cross-examination of various witnesses, he pointed out all these inconsistencies to the jury. Additionally, the jury was aware that Smith had gone to the store to buy beer immediately prior to the shooting and that he had a third offense DWI conviction. Det. Eserman testified that he had no reason to believe Smith was intoxicated at the time of the murder and noted that he did not believe Smith was intoxicated at the time of his statement. Further, Smith’s girlfriend, Margie McKeel, testified that Smith was not drinking, to her knowledge, when she arrived home between 6:00-6:30 p.m. on the night of Pierce’s murder.
The credibility of witnesses presenting conflicting testimony on factual matters is within the sound discretion of the trier of fact. State v. Jones, 08-20 (LaJifiApp. 5 Cir. 4/15/08); 985 So.2d 234, 240. The trier of fact shall evaluate the witnesses’ credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness. Id. It is not the function of the appellate court to second guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence. Id. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, this is a matter of the weight of the evidence, not its sufficiency. State v. Miller, 11-498 (La.App. 5 Cir. 12/13/11); 84 So.3d 611, 617, writ denied, 12-176 (La.9/14/12); 97 So.3d 1012.
We find that the jury made a credibility determination and chose to believe Smith despite the slight inconsistencies and over the testimony of Defendant’s alibi witnesses. A review of the record reflects that the jury’s credibility determination was rational. Thus, viewing the evidence in the light most favorable to the prosecution, we find the State proved Defendant’s identification as the perpetrator beyond a reasonable doubt.

Conspiracy to Commit Obstruction of Justice

Defendant next challenges the sufficiency of the evidence regarding his *523 conspiracy to commit obstruction of justice conviction. Criminal conspiracy requires an agreement or combination of two or more persons for the specific purpose of committing any crime, an act in furtherance of the object of the agreement or combination, and specific intent. La. R.S. 14:26. Obstruction of justice criminalizes (1) the use or threat of force toward the person or property of another with the specific intent to influence the testimony of any person in any criminal proceeding or cause or induce the withholding of testimony from any criminal proceeding; and (2) retaliating against any witness by knowingly engaging in conduct which results in bodily injury to such person with the specific |17intent to retaliate against the person for the attendance as a witness to any criminal proceeding or for producing evidence or testimony for use or potential use in any criminal proceeding. La. R.S. 14:130.1(A)(2) and (3).
Defendant contends the evidence for conspiracy to commit obstruction of justice was scant and was based solely on the inadmissible testimony of Det. Vasquez’s testimony as to the meaning of the jailhouse phone calls. We note that Defendant challenges the admissibility of Det. Vasquez’s testimony pertaining to the jailhouse phone calls in another assignment of error, which we will address separately, infra. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court first determines the sufficiency of the evidence, which takes into account the entirety of the evidence introduced at trial, both admissible and inadmissible. See State v. Hearold, 603 So.2d 731, 734 (La.1992).
A review of the record shows the evidence considered in its entirety is sufficient to support Defendant’s conviction for conspiracy to commit obstruction of justice. The State introduced numerous jailhouse phone calls between Defendant, Griffin, Nelson and other persons wherein there is much discussion regarding Smith being the sole eyewitness to Pierce’s murder. In these calls, Defendant is heard saying that all will be good as long as Smith does not testify and that Smith will not be coming to court. There is discussion about “pulling something off’ and not being able to locate Smith, which in Defendant’s words, “that’s going to work out in my favor.” There is further discussion about acquiring a “b*teh,” interpreted by Det. Vasquez as an untraceable gun, and “F*ck[ing] with Dude,” identified to be Smith. Smith is then murdered one day before a scheduled hearing on a motion to suppress identification in connection with the Pierce murder. We find that viewing the evidence in a light most favorable to the 11sprosecution, a rational trier of fact could have found beyond a reasonable doubt that the State proved the essential elements of conspiracy to commit obstruction of justice so as to support Defendant’s conviction.

Challenges for Cause

Defendant next argues that the trial court erred in denying his challenges for cause as to four prospective jurors: Marguerite Rankin, Maley Morris, Janis Brit-son, and Sheree Caminita. He maintains these prospective jurors’ responses during voir dire rendered them incapable of putting aside their beliefs and/or relationships in order to enable them to follow the law, thus rendering them incapable of being fair and impartial.
The Sixth Amendment to the United States Constitution guarantees the accused the right to trial by an impartial jury. State v. Munson, 12-327 (La.App. 5 Cir. 4/10/13); 115 So.3d 6, 12, writ denied, 13-1083 (La.11/22/13); 126 So.3d 476. Further, La. Const. Art. I, § 17 guarantees the accused the right to full voir dire *524 examination of prospective jurors and the right to challenges those jurors peremptorily.
Jurors may also be challenged for cause based on those grounds set forth in La.C.Cr.P. art. 797. A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Campbell, 06-286 (La.5/21/08); 983 So.2d 810, 858, cert. denied, 555 U.S. 1040, 129 S.Ct. 607, 172 L.Ed.2d 471 (2008). A trial court’s ruling on a challenge for cause will only be reversed where it appears, upon review of the voir dire examination as a whole, that the trial court’s exercise of its discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. State v.. Lee, 93-2810 (La.5/23/94); 637 So.2d 102, 108; State v. Passman, 345 So.2d 874, 880 (La.1977). Prejudice is ^presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges. State v. Lindsey, 06-255 (La.1/17/07); 948 So.2d 105, 107.
In the present case, Defendant was entitled to 12 peremptory challenges under La.C.Cr.P. art. 799.[19] During the first panel of jury selection, Defendant challenged prospective jurors Marguerite Rankin and Maley Morris for cause. Both challenges were denied, and Defendant used two peremptory challenges to exclude Ms. Rankin and Ms. Morris from the jury. During the second panel of jury selection, Defendant challenged prospective juror Janis Britson for cause, which was denied. Defendant had exhausted his 12 peremptory challenges prior to reaching Ms. Britson and, therefore, was unable to strike Ms. Britson from the jury. However, Ms. Britson was excluded from the jury by co-defendant Nelson who used one of his peremptory challenges on her. As for prospective juror Sheree Caminita, Defendant did not challenge her for cause, but rather co-defendant Griffin asserted the challenge for cause. Although Defendant did not expressly join in Griffin’s challenge for cause, La.C.Cr.P. art. 842 provides that where the'co-defendant objects, the objection is presumed to have been made by all defendants on trial unless the contrary appears. State v. Isaac, 487 So.2d 565, 568 (La.App. 4th Cir.1986), writ denied, 530 So.2d 80 (La.1988).
Because Defendant used his peremptory challenges to exclude Ms. Rankin and Ms. Morris and had exhausted his peremptory challenges prior to the challenges to Ms. Britson and Ms. Caminita and the empanelment of the jury, we find the trial court’s denial of Defendant’s challenges for cause are properly before us. However, based on the facts of this case, we do not find Defendant was 1 ^prejudiced by the trial court’s denial of the challenges for cause as to Ms. Britson and Ms. Cami-nita. While prejudice is generally presumed when a defendant exhausts his peremptory challenges, we do not find this presumption applies where multiple defendants are tried together and the ehal: lenged juror is ultimately removed from the jury by the use of a co-defendant’s peremptory challenge and that co-defendant did not exhaust his peremptory challenges. In light of the fact these two jurors did not sit on the jury because Defendant’s co-defendants used their per *525 emptory challenges to exclude them, we find Defendant was not prejudiced.[20]
As to prospective jurors Ms. Rankin and Ms. Morris, Defendant challenged them on the basis they could not be fair and impartial.
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11); 67 So.3d 535, 558, writ denied, 11-1753 (La.2/10/12); 80 So.3d 468, cert. denied,. — U.S. -, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). However, a challenge for cause is not warranted when a prospective juror has voiced an opinion seemingly prejudicial to the defense, but after further inquiry (frequently called | ⅞1 “rehabilitation”) the juror demonstrates the ability and willingness to decide the case impartially according to the law and the evidence. Id. at 559.
The trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror because he has the benefit of seeing the facial expressions and hearing the vocal intonations of the prospective jurors as they respond to questioning by the parties’ attorneys. State v. Jacobs, 67 So.3d at 559. Such expressions and intonations are not readily apparent at the appellate level where a review is based on a cold record. Id.
At the beginning of the voir dire process in the instant case, the prospective jurors were asked general questions by the court, followed by more specific questions by the State and the defense.

Prospective Juror Marguerite Rankin

As to Ms. Rankin, Defendant contended she could not be fair and impartial because she indicated that she wanted the defendants to testify. During voir dire, the State explained the burden of proof in a criminal case, the defendants’ presumption of innocence, and the defendants’ right not to testify. The State emphasized that no inference of guilt can be drawn from the fact that the defendants choose not to testify. The venire, as whole, indicated that they understood these concepts, and affirmatively guaranteed that they would not hold it against the defendants should they choose not to testify.
*526 Defendant’s counsel then asked Ms. Rankin what her vote would be if she thought the defendants “may be guilty,” to which Ms. Rankin responded they were not guilty until she had evidence. Counsel then posed a hypothetical asking Ms. Rankin to assume she heard some evidence that led her to think the defendants may be guilty. Ms. Rankin responded that she could not vote until she had the whole picture. Counsel later asked Ms. Rankin how she would vote if she heard a |2glot of evidence that led her to believe the defendants might have done it but she was not convinced beyond a reasonable doubt. Ms. Rankin responded, “I don’t know. I would still — I may go with guilty, but then I still — there could be a doubt.” Counsel continued to ask Ms. Rankin how she would vote if “[a] couple of things didn’t necessarily add up,” and she did not feel the State had proven its case beyond a reasonable doubt. Ms. Rankin answered that she would probably vote not guilty. Counsel probed Ms. Rankin’s “probable” not guilty vote by stating, “Probably go with not guilty, but we’ve got a tough decision here. I mean this is a murder trial,” to which Ms. Rankin responded, “And I would say put them on the stand.”
Defendant’s counsel later challenged Ms. Rankin for cause claiming that she wanted Defendant to take the stand and that she would not be able to judge the evidence fairly if he did not testify. The trial judge called Ms. Rankin to the stand and further questioned her as to whether she could follow the law and not hold it against a defendant if he chose not to testify. Ms. Rankin stated that she could and would follow the law and not hold it against a defendant if he did not testify. The trial court denied Defendant’s challenge for cause finding, “I think she was confused by the questioning. I do believe that she just told me one more time that she can follow the law.”
A review of the voir dire as a whole demonstrates that all of the potential jurors were informed of the defendants’ presumption of innocence, their right not to testify, and that no inference of any kind could be drawn if they chose not to testify. Ms. Rankin, along with the other prospective jurors indicated affirmatively that they understood the law and could follow it. Although at one point Ms. Rankin indicated that she would want to hear the defendants testify, it was the result of an ambiguous statement by counsel. When questioned by the trial judge, |asMs. Rankin again stated that she could follow the law and would not hold it against the defendants if they chose not to testify. Based on Ms. Rankin’s responses as a whole throughout voir dire, it is clear she understood and would follow the law. Accordingly, we do not find the trial court abused its discretion in denying Defendant’s challenge for cause.[21]

Prospective Juror Marley Morris

Defendant also challenged Ms. Morris on her inability to be fair and impartial based on her indication that she could vote guilty even if she was not convinced beyond a reasonable doubt. During voir dire, Defendant’s counsel asked Ms. Morris how she would vote if she had to vote “right now.” Ms. Morris stated that she would vote not guilty because she had not heard any evidence. When asked how she would vote if she thought a defendant “might be guilty,” Ms. Morris responded, “depends on what was presented and was *527 he able to prove, one way or the other.” Counsel then asked how she would vote if after a week she thought a defendant “may be guilty,” to which Ms. Moms answered “Guilty.” Counsel explained the law and asked the question again as follows:
Well, what if I told you that the State has to prove beyond a reasonable doubt? If I were to tell you that they have to prove their case beyond a reasonable doubt, which would assume that maybe or probably, is not beyond a reasonable doubt, you think you could vote not guilty, or do you think that I’m still going to vote guilty?
Ms. Morris answered, “Honestly, I’d probably still vote guilty.”
Thereafter, Defendant’s counsel challenged Ms. Morris for cause on the basis she would vote guilty even if she only felt Defendant “may be guilty.” The trial court called Ms. Morris to the stand and further questioned her regarding the State’s burden to prove guilt beyond a reasonable doubt. The trial court 1 P4specifically asked Ms. Morris if she understood Defendant’s counsel’s question about how she would vote if she thought a defendant may be guilty, to which she responded “No.” The trial court then again explained that the State has the burden to prove the defendants’ guilt beyond a reasonable doubt and that “maybe” and “probably” is not good enough. Ms. Morris indicated that she understood and that she understood the defendants did not have to defend. The trial judge denied Defendant’s challenge for cause, explaining that he believed Ms. Morris was confused by the question and that he was convinced Ms. Morris understands the concept that “maybe” and “probably” guilty is not enough, but that the State has to prove its case beyond a reasonable doubt.
A review of Ms. Morris’ voir dire responses as a whole demonstrates her willingness and ability to follow the law. The record shows that Ms. Morris initially appeared confused by Defendant’s counsel’s questions, but upon questioning by the trial court indicated her ability to understand and follow the law regarding the State’s burden of proof by agreeing with the trial court when it explained that “maybe” and “probably” guilty is not good enough. As such, we find the trial court did not abuse its discretion in denying Defendant’s challenge for cause as to Ms. Morris.[22]

Admission of Det Vasquez’s Testimony

In this assignment of error, Defendant argues the trial court erred in allowing Det. Vasquez to testify as a lay witness as to his interpretations of the recorded jailhouse conversations and the slang used by the defendants. In particular, [2SPefendant contends Det. Yasquez’s interpretation of the word “b*tch” to mean an untraceable gun was improperly admitted and was the only evidence the State offered to prove its conspiracy theory. Thus, Defendant maintains the admission of this evidence was not harmless error.
At trial, numerous taped jailhouse phone calls made using Defendant’s and Griffin’s *528 assigned PIN numbers were introduced into evidence and played for the jury during the testimony of Det. Vasquez. At the beginning of Det. Vasquez’s testimony, Griffin’s attorney made a preemptive objection to Det. Vasquez’s interpretation of the phone calls, including his decipherment of the “code” the speakers may have been using. Defendant’s counsel joined in the objection. The State contended that Det. Vasquez would be identifying the speakers and translating their conversations on the basis of his experience as a police officer. Griffin’s attorney maintained that Det. Vasquez’s translation was beyond lay witness testimony and required his qualification as an expert witness in “street slang.” The trial court found the objection premature.
After a weekend recess, the matter was discussed in further detail prior to the continuance of Det. Vasquez’s testimony. Defense counsel’s main objection was to Det. Vasquez’s anticipated interpretation of the term “b*teh,” as used by Griffin in one of the phone calls, to mean a firearm. The trial court ruled that Det. Vasquez would be prohibited from interpreting Griffin’s state of mind or her intent at the time of her statement, but that he would be permitted to explain to the jury what he has come to know the term “b*tch” to mean based on his many years of experience on the street as a police officer. The trial court determined Det. Vasquez’s testimony in this regard did not require him to be qualified as an expert.
Det. Vasquez then proceeded to testify that he listened to “hundreds of hours” of recorded jailhouse phone calls made by Defendant and Griffin toj^individuals outside the jail. Det. Vasquez testified that the defendants used lots of “code talk” and nicknames in their conversations. He explained that he was able to identify the various individuals participating in the telephone conversations based on listening to hours of phone calls and hearing names mentioned during the calls which identified the person being spoken to. Det. Vasquez stated that in those circumstances where he could not identify the speaker, he referenced the speaker as “unknown male” or “unknown female.” He admitted on cross-examination that he was not a voice expert, but stated that he had come to learn the various voices after listening to the “hours and hours” of phone calls and corresponding PIN numbers.[23]
Det. Vasquez testified that of the 17 discs of recorded phone calls, he found seven of the discs to be relevant to the investigation of the present case. The pertinent phone conversations were transcribed and played for the jury. One of the key phone calls was on June 8, 2011 between Griffin and her brother, wherein Griffin used the term “b*tch” several times. Det. Vasquez explained that in his nine years as a police officers and the “countless” cases he has investigated, he has become familiar with the use of various slang terms used by individuals who live in the communities he patrols within Jefferson Parish. He testified that he has heard the term “b*tch” used in a variety of different contexts, and that in the context of the phone call at issue the term referred to an untraceable gun.
The testimony of a lay witness in the form of opinions or inferences, who is not testifying as an expert, is limited to those opinions or inferences that are rationally based on the perception of the witness and are helpful to a clear understanding of the testimony or the determination of a fact in issue. La. C.E. art. 701;
*529 State v. Keller, 09-403 (La.App. 5 Cir. 12/29/09); 30 So.3d 919, 930-31, writ denied, 10-267 (La.9/17/10); 45 So.3d 1041. A law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert. See State v. LeBlanc, 05-885 (La.App. 1 Cir. 2/10/06); 928 So.2d 599, 603. However, only experts are allowed to give opinion testimony in areas of specialized knowledge.[24] A reviewing court must ask two questions to determine whether the trial court properly allowed lay opinion testimony: (1) was the testimony speculative opinion evidence or simply a recitation of or inferences from fact based upon the witness’ observations; and (2) if erroneously admitted, was the testimony so prejudicial to the defense as to constitute reversible error. Id. at 602-03.
“Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact.” La. C.E. art. 704; State v. Higgins, 03-1980 (La.4/1/05); 898 So.2d 1219, 1234, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). In other words, the fact an opinion or inference embraces an ultimate issue in a case does not preclude its admissibility. La. C.E. art. 704, Comment (c); State v. King, 99-1279 (La.App. 5 Cir. 4/25/00); 760 So.2d 540, 543, writs denied, 00-1452 and 00-1498 (La.3/16/01); 787 So.2d 298. The trial court is vested with much discretion in determining which opinion testimony shall be received into evidence as lay or expert testimony. State v. Friday, 10-2309 (La.App. 1 Cir. 6/17/11); 73 So.3d 913, 922, writ denied, 11-1456 (La.4/20/12); 85 So.3d 1258.
Upon review, we find the trial court did not err in allowing Det. Vasquez to testify as a lay witness under La. C.E. art. 701 as to inferences regarding the contents of the recorded phone conversations based on his own observations and Inexperiences. In State v. Decay, 01-192 (La.App. 5 Cir. 9/13/01); 798 So.2d 1057, 1072-74, writ denied, 01-2724 (La.8/30/02); 823 So.2d 939, this Court found a trooper’s testimony interpreting “slang” in a telephone conversation to be permissible lay testimony under La. C.E. art. 701, despite the defendant’s argument that expert testimony was required and that the trooper had not been qualified as an expert. The trooper in Decay interpreted the defendant’s statement, “I be trying to get me about two, bra,” to mean that the defendant wished to buy two kilograms of cocaine. This Court determined that the trooper’s testimony was to inferences made based on his observations and his experience of being a State trooper for seven years.
Additionally, in State v. Jefferson, 04-1960 (La.App. 4 Cir. 12/21/05); 922 So.2d 577, 296-97, writ denied, 06-940 (La.10/27/06); 939 So.2d 1276, the defendant objected to a detective’s identification of an eyewitness’ voice on a 9-1-1 recording. The detective testified that he recognized the witness’ voice based on the time he spent with him during his interview and investigation of the case. The Fourth Circuit found the detective’s opinion regarding the identification of the voice was rationally based on his perception and was helpful to a determination of a fact in issue regarding the phone call, thereby satisfying the requirements of La. C.E. art. 701.
*530 Furthermore, we are persuaded by King v. United States, 74 A.3d 678 (D.C.2013), cited by the State, which interprets the Federal Rules of Evidence upon which La. C.E. art. 701 is based.[25] In King, the defendant argued the trial court erred in allowing a police officer and a detective to testify as lay witnesses as to the | ^meaning of certain “street lingo” used in recorded jailhouse phone calls.[26] The defendant maintained the officers were testifying about a specialized subject beyond the understanding of the average lay person. The officers explained that they based their “street lingo” interpretations on' their lengthy experience working on criminal investigations in the area and regularly speaking about crime with young people in that community. The appellate court found the trial court properly admitted the officers’ testimony as lay witness testimony because “the witnesses based their opinions on their personal experiences and observations and used reasoning processes familiar to the average person in everyday life to reach their proffered opinion.”
The appellate court explained that lay testimony is that which “results from a process of reasoning familiar in everyday life,” whereas “an expert’s testimony results from a process of reasoning which can be mastered only by specialists in the field.” King, 74 A.3d at 682 (internal citations omitted). The court concluded that the “reasoning process employed to interpret the street language was the everyday process of language acquisition” and that the officers “did not use any special training or scientific or other specialized professional knowledge to form their opinions about the meaning of the language used by the individuals in this case.” Id. at 683.
In this cage, Det. Vasquez testified as to his opinion of the meaning of certain “slang” words in the recorded phone calls based on his personal experiences and observations. Specifically, Det. Vasquez stated that his knowledge was gained from his nine years of experience as a police officer and the “countless” cases he has investigated in the community. He explained that he has |ancome to understand the meaning of. various slang terms through his contact with and interviewing of various individuals during his employment as a police officer. He further explained that he was able to identify the various individuals in the phone calls from listening to “hundreds of hours” of phone calls involving the defendants and his investigation into the case.
Thus, we conclude that Det. Vasquez’s opinion was properly admitted as lay testimony that resulted from his observations and experiences as a police officer. We find his opinions resulted -from the “process of reasoning familiar in everyday life,” as opposed to “a process of reasoning which can be mastered only by specialists in the field.” Further, Det. Vasquez’s testimony provided the jury with relevant factual information about the investigation, including the meanings of terms used in the conversations and the identification of the individuals referenced during the phone calls.

Admission of Smith’s Statement

In his final assignment of error, Defendant challenges the admission of Smith’s statement as inadmissible hearsay. *531 He contends the trial court erred in allowing the statement under the “forfeiture by wrongdoing” hearsay exception embodied in La. C.E. art. 804(B)(7)(a). In particular, Defendant maintains the State failed to establish by a preponderance of the evidence that he was the person that procured Smith’s absence from trial. He further argues that the admission of Smith’s statement denied him of his right to confrontation as set forth in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), thereby rendering La. C.E. art. 804(B)(7)(a) unconstitutional.
Prior to trial, hearings were held on the State’s motion to admit Smith’s statement under La. C.E. art. 804(B)(7)(a). During the hearings, Det. Vasquez testified that Defendant and Griffin were identified by eyewitness Smith as |S1 shooters in Pierce’s murder. Smith was subsequently murdered outside of his home on August 17, 2011, the day before a scheduled motion to suppress identification hearing in the Pierce case. Det. Vasquez explained that a witness saw Smith’s assailant flee the scene in the direction of Defendant’s residence, but was unable to identify the perpetrator because his face was partially covered with a bandana. However, the witness described the assailant as a thin black male, between 5'8" and 5'9", medium skinned with short dreadlocks. Det. Vasquez testified that he prepared a photographic lineup of Defendant’s brother, Nelson, who fit the description of the assailant, and showed it to the witness who identified Nelson “as being the most familiar and most like the subject he saw running away from the victim.” Det. Vasquez also testified that Nelson’s cell phone records placed him within the area of Smith’s residence at the time of his murder and showed that he left the area within minutes after the murder.
Det. Vasquez further testified that Defendant and Griffin were in jail at the time Smith was killed, and that he listened to numerous jailhouse phone calls they made while incarcerated. The recorded phone calls introduced at trial were also introduced at the 804 motion hearing. Det. Vasquez explained that the phone calls linked Defendant, Griffin and Nelson and showed they had a method of communication between them.
Det. Vasquez noted that Smith had been previously threatened — once by Defendant the day after Pierce’s murder and once by Griffin’s father who told Smith that he would not “make it to court” if he testified at trial. Det. Vasquez explained that at the time Smith was interviewed, he feared for his life and, was concerned he may be retaliated against for being a witness in the Pierce murder trial.
| aaDet. Vasquez explained that Defendant’s involvement in Smith’s murder was evident from the jailhouse phone calls. He noted Defendant expressed his satisfaction that Smith had been killed and stated that he would “be home soon,” since Smith was the only reason he was still in jail.
The trial court initially denied the State’s 804(B)(7) motion, finding the State had not met its burden of proof in establishing by a preponderance of the .evidence that Defendant and Griffin “engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a 'witness.” Upon the State’s motion for reconsideration and its submission of additional jailhouse phone conversations, the trial court vacated its original ruling and found Smith’s statement was admissible for use at trial.
The Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to confront the witnesses against him. *532 State v. Jackson, 03-883 (La.App. 5 Cir. 4/27/04); 880 So.2d 841, 852, writ denied, 04-1399 (La.11/8/04); 885 So.2d 1118. In Crawford, supra, the Supreme Court restricted the admissibility of testimonial statements as evidence at a criminal trial in situations where the declarant is unavailable to testify and required that the defendant have a prior opportunity to cross-examine the declarant.[27] However, the Crawford court recognized exceptions to the right of confrontation, including the doctrine of “forfeiture by wrongdoing,” which is premised on the principal that a defendant should not be permitted to benefit from his own wrongdoing. State v. Warner, 12-85 (La.App. 4 Cir. 5/1/13); 116 So.3d 811, 820.
Isaln order to admit testimonial hearsay evidence under the forfeiture by wrongdoing exception, the prosecution must show that the defendant intended to prevent a witness from testifying. Giles v. California; 554 U.S. 353, 361, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008). This includes situations, as set forth under Federal Rule of Evidence 804(b)(6), where the defendant engages in or acquiesces in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness. Id., 554 U.S. at 367, 128 S.Ct. at 2687, citing Davis v. Washington, 547 U.S. 813, 833, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
Under La. C.E. art. 804(B)(7), which is modeled after Federal Rule of Evidence 804(b)(6), “[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness,” is an exception to the hearsay rule. The party seeking to introduce the statement under this exception must establish by a preponderance of the evidence that the party against whom the statement is being offered engaged or acquiesced in the wrongdoing. La. C.E. art. 804(B)(7)(b).
In the present case, Defendant admits in his brief that the evidence shows he acquiesced in the wrongdoing, but he maintains that acquiescence in the wrongdoing is insufficient to allow admission of a hearsay statement. As stated above, the United States Supreme Court has approved of the application of the forfeiture by wrongdoing exception to hearsay where a defendant acquiesces in the wrongdoing as long as he had the intent of making the witness unavailable. See Giles, 554 U.S. at 367, 128 S.Ct. 2687.
The evidence offered by the State, including Det. Vasquez’s testimony and the recorded phone conversations made by Defendant and Griffin, establishes by a preponderance of the evidence that Smith’s murder was committed to ensure his ^unavailability as a witness at Defendant’s murder trial, and that Defendant acquiesced in the wrongdoing that procured Smith’s unavailability.
Before Smith was murdered, he expressed fear for his life and believed he would suffer retaliation for his testimony against Defendant and Griffin in the *533 Pierce murder trial. Smith’s life was threatened by Defendant the day after Pierce was murdered and was also threatened by Griffin’s father when it became apparent that Smith would likely testify at trial. Smith was murdered shortly after the State provided a discovery packet to the defense naming Smith as a witness, and one day before a hearing on Defendant’s motion to suppress identification.
Investigation into Smith’s murder pointed to Defendant’s brother as the shooter, whose only apparent motive was the fact Smith was the only witness in the murder case pending against Defendant. Numerous jailhouse phone conversations following Defendant’s arrest for Pierce’s murder established that Defendant engaged in discussions with multiple individuals about Smith being the only eyewitness to Pierce’s murder. The phone calls demonstrated Defendant’s desire and effort to procure Smith’s unavailability for trial. Specifically, four days after Pierce’s murder, Defendant told an unknown male that everything will be fine as long as Smith did not say anything. Additionally, in the days following Pierce’s murder, Defendant discussed his expectation that Smith would not testify at trial, as deduced from his statement, “[w]ell, they got one witness, but, you know what I’m saying, he ain’t, he ain’t coming to court or whatever.”
Further, Defendant later discussed with his friend Stevenson that Defendant’s brother had been tasked with taking care of Smith, as evidenced by his statement that his lawyer told him “they got one witness but uh your little brother is on that. When he told me, I already knew what it was...” Defendant’s friend Stevenson further conveyed to Defendant that Griffin’s father had talked to Smith.
| ssAfter Smith had been killed, Defendant spoke to Nelson to confirm the fact Smith had been killed. In this same phone call, Nelson told Defendant that their mother did not want him talking on the phone to Defendant because the call could be traced.
Based on this evidence, we find no error in the trial court’s determination that the State met its burden of proving by a preponderance of the evidence that Defendant engaged or acquiesced in wrongdoing intended to procure Smith’s unavailability for trial and in applying the forfeiture by wrongdoing exception to the hearsay rule thereby .allowing Smith’s statement into evidence at trial.[28] Thus, we find Smith’s statement to the police was properly admitted into evidence at trial and its admission did not violate Defendant’s Sixth Amendment right to confrontation.

ERRORS PATENT

Upon review of the record for errors patent under La.C.Cr.P. art. 920, we note *534 the following errors that require corrective action.
First, the trial court imposed an illegal sentence on count four. At the time Defendant committed the offense,[29] the maximum sentence for attempted possession of a firearm by a convicted felon allowed under La. R.S. 14:95.1(B) was seven and one-half years and a fine of not less than $500 nor more than $2,500. However, Defendant was sentenced to 10 years imprisonment without benefit of parole, probation, or suspension of sentence.
¡ ^Pursuant to La.C.Cr.P. art. 882, an appellate court can correct an illegal sentence at any time. However, an appellate court is authorized to correct an illegal sentence when the exercise of sentencing discretion is not involved. State v. Mason, 10-284 (La.App. 5 Cir. 1/11/11); 59 So.3d 419, 430, writ denied, 11-306 (La.6/24/11); 64 So.3d 216. La. R.S. 14:95.1(B) provides that “whoever is found guilty of attempting to violate the provisions of this Section shall be imprisoned at hard labor for not more than seven and one-half years and fined not less than five hundred dollars nor more than two thousand five hundred dollars.” Accordingly, there is discretion involved. Therefore, we vacate Defendant’s 10-year sentence on count four, attempted possession of a firearm by a convicted felon, and remand the matter to the district court for resentencing pursuant to the statutes.
Additionally, there are discrepancies between the commitment and the transcript.[30] First, the commitment incorrectly reflects Defendant was convicted of possession of a firearm by a convicted felon on count four, when he was in fact convicted of attempted possession of a firearm by a convicted felon. Second, the transcript reflects that the trial court imposed Defendant’s 20-year sentence on count three (felon in possession of a firearm) without benefit of parole, probation, or suspension of sentence, but the commitment does not reflect these restrictions.
Further, there are several errors with respect to the State of Louisiana Uniform Commitment Order: (1) it does not set forth the offense date for each of Defendant’s convictions; (2) it does not reflect that Defendant’s 20-year sentence on count three is to be served without benefit of parole, probation, or suspension of sentence; and (3) it incorrectly reflects Defendant was found guilty of “14:95.1 Convicted Felon With A Weapon” on count four, when Defendant was actually found guilty of attempted possession of a firearm by a convicted felon.
^Accordingly, we remand the matter for correction of the commitment and the State of Louisiana Uniform Commitment Order as noted above, and the Clerk of Court for the 24th Judicial District Court is ordered to transmit the original of the corrected commitment and Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and the Department of Corrections’ legal department. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12); 106 So.3d 1136, 1142.

DECREE

For the foregoing reasons, Defendant, Quentin McClure’s, convictions are hereby *535 affirmed. His sentences on all convictions, except count four (attempted possession of a firearm by a convicted felon), are also affirmed. Defendant’s 10-year sentence on count four for attempted possession of a firearm by a convicted felon is vacated, and the matter is remanded for resentenc-ing Defendant on count four as instructed above. Additionally, the matter is remanded for the correction of the commitment and the Uniform Commitment Order as instructed above.

CONVICTIONS AFFIRMED; SENTENCES AFFIRMED EXCEPT ON COUNT FOUR, WHICH IS VACATED; REMANDED FOR RESENTENCING ON COUNT FOUR; REMANDED FOR CORRECTION OF COMMITMENT

. Co-defendant Griffin was also charged with the second degree murder of Theodore Pierce, possession of a firearm by a convicted felon, and conspiracy to commit obstruction of justice. Co-defendant Nelson was charged with the second degree murder of eyewitness Charles Smith, possession of a firearm by a convicted felon, and conspiracy to commit obstruction of justice.

. Co-defendants Griffin and Nelson were also found guilty as charged on all counts. The appeals of Griffin and Nelson have been separately docketed in this Court under case numbers 14-KA-251 and 14-KA-252, respectively.

. The residence located at 235 Fourth St. belonged to Keith Porter, who Pierce was visiting.

. Photographic lineups of Defendant and Griffin were prepared after police received the anonymous tip specifically naming them as being involved in the shooting.

. Brenda Mitchell lived at this address. She told police that she saw someone shooting, but she could not identify the shooter.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The anonymous tip to police after Pierce’s murder named Tenisha Williams, Reginald Lewis’ girlfriend, and Dwayne Lewis, Reginald Lewis’ brother, as the two other people being involved in the Pierce shooting.

. Det. Eserman testified that a suspect in the Lewis murder had been arrested prior to Pierce's murder and that there was no information in Lewis' murder investigation that showed Pierce was involved in Lewis’ murder.

. Two guns were seized from the residence; however, neither gun was found to have any connection to Pierce's murder.

. Joseph Trawkicki, custodian of records for Sprint, testified that he provided cell phone records for a phone number listing Griffin as the subscriber. The phone records indicated that an inbound call was received on Griffin’s phone from Defendant’s cell phone number shortly before Pierce's murder at 4:18 p.m. on January 2, 2011. The records further showed that a second outgoing call was made from Griffin’s phone to Defendant’s phone at 4:21 p.m. on the same day. These two calls used a cell phone tower in Bridge City. Thereafter, at 4:47 p.m., an inbound call to Griffin’s phone used a cell phone tower in St. Rose.

. The trial court took judicial notice of the fact the record did not contain a subpoena for Smith to testify at the August 18, 2011 motion hearing. Detective Matthew Vasquez explained to the jury that eyewitnesses are not typically called to testify at such pretrial hearings, but rather police officers are the ones who testify.

. Det. Vasquez explained that each inmate has a PIN, or identification, number that he or she enters when making a call and that all phone calls are recorded.

. On cross-examination, Det. Vasquez disagreed with Defendant’s counsel who argued that Defendant was not the person speaking during this portion of the phone conversation. Counsel argued that Defendant handed the phone to someone in jail named "Jeb or Jab,” a.k.a. Jabori Davis, and that it was Davis, not Defendant, who was talking about how he got caught. Defense witness Jeremy Feazell testified that the voice previously identified by Det. Vasquez as Defendant’s, was actually his cousin, Davis’, voice. The parties stipulated that Davis was incarcerated in JPCC at the time of the phone call on January 27, 2011, and that he a court date in February 2011.

. Det. Vasquez testified that Griffin was referring to Charles Smith.

. Griffin testified that this phone conversation was misinterpreted by Det. Vasquez. She claimed that her brother’s statement, "heard we pulling something off,” referred to her brother's attempt to acquire funds to pay for her lawyer. Griffin explained that her brother wanted to sell drugs to pay her lawyer’s fee but he was having trouble getting the drugs from a supplier. Griffin explained her reference to the term "b*tch” was a reference to her drug supplier’s female friends. According to Griffin, she told her brother to contact one of the supplier’s female friends, a.k.a "b*tch,” and have them buy the drugs because the supplier would be more inclined to sell drugs to one of his "girls.”

. The question of sufficiency of the evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal. La.C.Cr.P. art. 821; State v. Hooker, 05-251 (La.App. 5 Cir. 1/17/06); 921 So.2d 1066, 1074. In the present case, Defendant did not file such a motion; however, the failure to file a post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Robinson, 04-964 (La.App. 5 Cir. 2/15/05); 896 So.2d 1115, 1120, n. 3.

. In his brief, Defendant also claimed the evidence was insufficient for his witness intimidation conviction; but, he failed to set forth any argument in this regard. Uniform Rules — Courts of Appeal, Rule 2-12.4 requires that all assignments of error must be briefed or the appellate court may consider the assigned error as abandoned. Because Defendant has failed to make any argument or cite any authority pertaining to his witness intimidation conviction, we consider his assertion there was insufficient evidence for this conviction to be abandoned. See State v. Jacobs, 07-887 (La.App. 5 Cir. 5/24/11); 67 So.3d 535, 588, writ denied, 11-1753 (La.2/10/12); 80 So.3d 468. However, under State v. Raymo, 419 So.2d 858, 861 (La.1982), we considered the sufficiency of the evidence of Defendant's witness intimidation conviction in our errors patent review and found that all statutory elements of the offense were proven by the State.
We note that Defendant expressly stated that he was not challenging the sufficiency of the evidence for his convictions for possession of a firearm by a convicted felon and attempted possession of a firearm by a convicted felon. Again, under Raymo, we considered the sufficiency of the evidence for these offenses and determined all statutory elements of the offense were proven by the State.

. Mr. Porter did not testify at trial. This information was elicited through Kenny Bor-delon, an assistant district attorney, who had interviewed Mr. Porter in connection with screening the case for prosecution.

. In trials of offenses punishable necessarily by imprisonment at hard labor, each defendant shall have 12 peremptory challenges. La.C.Cr.P. art. 799. Defendant was tried for crimes necessarily punishable by imprisonment at hard labor. See La. R.S. 14:30.1; La. R.S. 14:95.1; La. R.S. 14:129.1; and La. R.S. 14:26 and 14:130.1(A)(2) and/or (3).

. Nonetheless, we note the trial court did not abuse its discretion in denying the challenges for cause as to Ms. Britson and Ms. Caminita. Defendant challenged Ms. Britson claiming she could not be fair and impartial because she did not like vulgar language, blood or gore. The trial court further questioned Ms. Britson who confirmed that vulgar language is offensive to her; however, she stated that it would not alter her opinion as to whether someone was guilty or not. The trial court denied Defendant's challenge for cause finding that although Ms. Britson did not approve of vulgar language, she “clearly stated that she would not convict somebody or find them guilty just because they use bad language.”
As for Ms. Caminita, co-defendant’s counsel challenged her on the basis of her close relationship with her father who was a Jefferson Parish Sheriff’s Deputy. He argued that Ms. Caminita indicated a possible negative impact on her relationship with her father if she voted not guilty. The trial court recalled Ms. Caminita’s testimony and found that Ms. Caminita simply stated she and her father might disagree if she were to find any of the defendants not guilty. When asked by defense counsel whether she would “have a problem telling [her father] that you voted not guilty,” Ms. Caminita explained that her father would probably not be happy about it because "he's got his own personal opinions” and that she did not know if her father would necessarily agree with her "opinion.”

. See State v. Mickel, 01-47 (La.App. 5 Cir. 5/29/07); 961 So.2d 516, 522, writ denied, 07-1422 (La.1/7/08); 973 So.2d 732, where this Court found that despite the prospective juror’s inclination to want the defendant to testify, after review of the voir dire as a whole, it was apparent that the prospective juror understood the law and could apply it fairly.

. See State v. Eugene, 03-1336 (La.App. 5 Cir. 3/30/04); 871 So.2d 584, writ denied, 04-1080 (La.11/15/04); 888 So.2d 766, where defense counsel argued on appeal that the trial court erred in denying his challenge for cause on the basis that the prospective juror had a problem with the State's burden of proving the defendant’s guilt beyond a reasonable doubt. The prospective juror was asked, "if you had some uncertainty about it and the law requires you to vote not guilty in that situation, would you be okay with that?” and the juror responded, "I'm not really sure.” In finding the trial court did not abuse its discretion in denying the defendant's challenge for cause, this Court noted that counsel's question was unclear and the record did not support a finding that the juror was unwilling or unable to follow the law. Id. at 588-89.

. As previously noted, each inmate has a PIN, or identification, number that he or she enters when making a call from JPCC, and that all phone calls are recorded.

. Under La. C.E. art. 702, ''[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”

. See Louisiana Official Revision Comment (b) to La. C.E. art. 701, “This Article follows Federal Rule of Evidence 701 verbatim.”

. The officer testified that the term "gleezy” is a street term for a Glock gun and that the term "40” referred to a .40 caliber semiautomatic gun. Additionally, the detective testified that the term “bagged” meant robbing someone and stealing their stash.

. While the Crawford court did not fully define ''testimonial/' it recognized that the Sixth Amendment bestows a right of confrontation to a defendant to confront witnesses who “bear testimony” against him. The Supreme Court noted that "an accuser who makes a formal statement to government officials bears testimony in a sense that a person making a casual remark to an acquaintance does not.” Crawford, 541 U.S. at 51, 124 S.Ct. at 1364. The Crawford court referred to statements as testimonial that were made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial. State v. Leonard, 05-42 (La.App. 5 Cir. 7/26/05); 910 So.2d 977, 989-90, writ denied, 06-2241 (La.6/1/07); 957 So.2d 165.

. See State v. Johnson, 13-343 (La.App. 4 Cir. 10/1/14), 2014 La.App. Unpub. LEXIS 555, where the Fourth Circuit found the State established by a preponderance of the evidence, based on two phone calls made by the defendant on the same day the declarant was murdered, that the defendant procured or acquiesced in the murder of the declarant and, thus, the forfeiture by wrongdoing exception applied to allow the admission of the declar-ant’s statement to police; United States v. Dinkins, 691 F.3d 358, 384 (4th Cir.2012), cert. denied, - U.S. -, 133 S.Ct. 1278, 185 L.Ed.2d 214, 81 U.S.L.W. 3454, where the federal appellate court found that the forfeiture by wrongdoing exception applied to a defendant whose co-conspirators murdered a declarant intending to prevent him from testifying, which was reasonably foreseeable by the defendant and in furtherance of the conspiracy; and United States v. Cherry, 217 F.3d 811, 820 (10th Cir.2000), holding that a “de-clarant’s statements may be admitted against a person who participated in a conspiracy to silence the declarant even if that person did not himself engage in witness intimidation or other wrongdoing.”

. The law in effect at the time of the commission of the offense is determinative of the penalty which the convicted accused must suffer. State v. Sugasti, 01-3407 (La.6/21/02); 820 So.2d 518, 520-22.

. Generally, the transcript prevails when there is a discrepancy between the commitment and the transcript. State v. Lynch, 441 So.2d 732, 734 (La.1983).