STATE OF LOUISIANA

VERSUS

TERONE R THOMAS

NO. 23-KA-234

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 19-4399, DIVISION "P"
HONORABLE LEE V. FAULKNER, JR., JUDGE PRESIDING

December 27, 2023

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and Stephen J. Windhorst

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED**
**WITH INSTRUCTIONS**
    **MEJ**
    **FHW**
    **SJW**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Andrea F. Long
Brittany Beckner

COUNSEL FOR DEFENDANT/APPELLANT,
TERONE R THOMAS
Lieu T. Vo Clark

**JOHNSON, J.**

Defendant/Appellant, Terone R. Thomas, appeals the sentence for his simple arson conviction rendered in the 24th Judicial District Court, Division "P". For the following reasons, we affirm Defendant's conviction, vacate Defendant's sentence and remand the matter with instructions.

## FACTS AND PROCEDURAL HISTORY

On September 19, 2019, the Jefferson Parish District Attorney filed a bill of information, charging Defendant, Terone R. Thomas, with two counts of aggravated arson, in violation of La. R.S. 14:51, against Debra Lindsey (count one), and a six-year-old female (count two).[1] Defendant was arraigned and entered a plea of not guilty on September 25, 2019. Pre-trial motions were filed, including discovery motions, a motion to suppress, and a motion for preliminary examination. On April 25, 2022, count two of the bill was *nolle prossed*. On the same date, the State amended count one to read: "…located at 2032/2034 James Drive in Marrero, LA belonging to another with damage amounting to $500 or more where it was foreseeable that human life might be endangered."

Trial began on May 3, 2022. At trial, the State called nine witnesses who testified about the fire itself, as well as the investigations thereafter. Donna Mazarac testified that she lived in a duplex located at 2036 James Drive and rented out the other side, which was 2038 James Drive. She testified that she knew the residents of 2032 James Drive, Debra Lindsey and Debra's granddaughter

---

[1] As to count one, the bill provides that Defendant:
    violated La.R.S.14:51 in that he did commit aggravated arson of a residential duplex, located at 2032 and 2034 James Drive in Marrero, LA belonging to Debra Lindsey….

As to count two, the bill provides that Defendant:
    violated La.R.S.14:51 in that he did commit aggravated arson of a residential duplex, located at 2032 and 2034 James Drive in Marrero, LA belonging to a six year old, black female, known to the State of Louisiana….

(Heaven). She did not know who lived in the back residence at 2034 James Drive because people moved in and out. On December 12, 2018, she was in the back yard feeding her dogs when she heard a "boom" and saw an object fly in the sky. She testified that she believed the object was the back door of the residence. She then took out her phone and started taking pictures of the smoke and flames coming from 2032/2034 James Drive.[2] Ms. Mazarac testified that she called 9-1-1 to report the fire. She screamed for Ms. Lindsey, and Ms. Lindsey indicated that she was okay. She explained that she went to the "front," and the residence was totally engulfed by flames. She testified that she saw Ms. Lindsey, her son (Robert), and Ms. Lindsey's granddaughter. She testified that from her security camera, she saw a silver car leaving the scene. She explained that a police officer wanted to see the footage from her security camera.

Firefighter Nick Knight testified that he received a call on December 12, 2018, of a fire on James Drive, in Marrero, Louisiana. While at the fire department, he could see black smoke coming from the direction of James Drive. When he arrived, the door to 2034 James Drive (located at the back of the residence) was open. He observed smoke and flames coming out of the doors and windows. He attempted to enter the residence, but the heat was too intense, so he made an "exterior attack." He testified that once he and the other firefighters were able to get the fire under control, they entered the residence. He observed that all of the windows in the residence were broken, and he observed broken glass and pieces of the window blinds outside. He testified that upon exploring the residence, it was obvious to him that the scene of the fire began in the back left bedroom. He explained that it was a total loss and everything inside was burnt.

Deputy Eric Glorioso testified that when he was dispatched to 2032/2034

---

[2] From Ms. Mazarac's testimony about the photos she took with her phone, her back yard faced the backyard of 2032/2034 James Drive.

James Drive, he was approximately two miles away and could see the smoke from his location. He said that it took him about two to three minutes to arrive, and Defendant was not present when he arrived. He explained that Ms. Lindsey was present, and he took a voluntary statement from her. He testified that he did not speak to anyone from 2034 James Drive, but he received a call from Terri Stewart, Defendant's mother, later that day.[3] He testified that the arson detective was called to the scene and that this was typical protocol. He testified that he wrote an initial report regarding the incident, and he included in his report that Ms. Lindsey told him that she heard defendant say, "We did it wrong. That's too much."[4]

Debra Lindsey testified that she lived at 2032 James Drive for 10 years. The residence was a duplex, and she lived in 2032, the front unit. She testified that Terri Stewart and Defendant (Ms. Stewart's son) lived in 2034, the back unit. She explained that she had a positive relationship with Ms. Stewart at first, but their relationship changed over a parking spot dispute. When Ms. Stewart first moved to the residence, Ms. Lindsey did not have a vehicle; so, Ms. Stewart parked in her spot. Ms. Lindsey explained that when she got a vehicle and parked it in the spot to get groceries out, Ms. Stewart went "ballistic" and called the police. She testified that Ms. Stewart called the police on her multiple times and made things up, like that they had broken into her house and damaged her vehicle.

Ms. Lindsey's son, Robert Lindsey, was periodically living with her in December 2018. Ms. Lindsey's daughter, Deja Ney, and her granddaughter were also staying with her. She testified that on December 12, 2018, she was watching television in her bedroom when she heard two booms. After the first boom, she jumped up and met her granddaughter in the hall. They both heard another boom,

---

[3] Terri Stewart and Defendant were later established to be the residents of 2034 James Drive.

[4] Ms. Stewart later testified that she did not hear Defendant say this but heard someone else say it to Defendant.

and her son came in the house and told them to get out.  She explained that the back apartment was on fire.  They went across the street, and she called the police.  The fire department arrived.

Ms. Lindsey testified that when she went out the door, she saw Defendant and another man coming out of the door.  She did not recognize the man who was with Defendant.  She explained that Defendant's face and arm were on fire and burnt, appearing red.  She testified that she heard the other man telling Defendant "You put too much" or "You did too much."  She did not hear Defendant say anything.  She saw Defendant and the man get in "a little gray Mitsubishi, or whatever it was" and leave the scene.  She explained that she spoke to the police when they arrived and provided them with a written statement.  She testified that the officer wrote down what she told him.  After being shown a photo of Defendant, she identified him.

Ms. Lindsey testified that Defendant did not come back on the scene when officers arrived, but his mother came back in the vehicle in which they left.  Ms. Lindsey testified that the fire affected her, and she had to stay with someone else and sleep on the floor.  She stated that the time was hectic and her blood pressure was affected.  She testified that the fire had an impact on her granddaughter, and she had to talk to a psychologist.

Heaven Lewis testified that her grandmother, Ms. Lindsey, raised her.  She testified that she was about six years old at the time of the fire.  On December 12, 2018, she was watching television and her grandmother was in her room.  They heard a loud boom and both ran into the hallway.  Her Uncle Robert ran into the house to get them because the house was on fire.  She remembered going to the other side of the street and the fire department arriving.  She testified that it sounded like glass broke when she heard the boom.  She explained that she lost all of her clothes and sometimes has dreams about that day.  She spoke to a school

counselor about the incident.

Deputy Nathan Gonzales testified that on December 12, 2018, he was dispatched to West Jefferson Medical Center in reference to the scene at 2032/2034 James Drive. He explained that dispatch informed him that someone who was hurt at the house fire was at the hospital. Deputy Gonzales testified that he had no knowledge of how the fire started and only knew that someone was injured. He went to the ER and met with Defendant, who told him that he was in a house fire.

Defendant told Deputy Gonzales that he was in his mother's bedroom watching television, and his brother was in the front room playing a computer game, when he heard a crash and what sounded like glass breaking. Defendant stated that when he exited the bedroom, it was hot in the hallway. He said that he smelled something but did not know what it was, and he opened the door to one of the bedrooms in the house. Defendant stated that he was immediately hit with flames, fire, and heat. He said he was blown back and hit the wall. Defendant told the deputy that he got up and ran out of the house. Deputy Gonzales testified that Defendant also told him that his brother grabbed him and pulled him out of the house. Todd Rivere, lead investigator with the arson section, arrived at the hospital and was informed by Deputy Gonzales of his conversation with Defendant. Deputy Gonzales testified that he did not record his conversation with Defendant, and Defendant was not arrested, interrogated, or read his rights. Deputy Gonzales testified that Defendant was not a suspect at that time.

Sergeant Todd Rivere testified that in December 2018 he was commander in JPSO's arson division. He explained that he heard the call come in about an active fire in which a complainant described hearing an explosion. The deputy who arrived on scene said there was potentially a resident in the rear. The residence was an enjoined duplex under one roof. He elected to respond to the call due to the

propensity for endangerment of life. When Sergeant Rivere arrived, firefighters were already on the scene. No residents from 2034 James Drive were present, but he spoke to Ms. Lindsey and her son who resided at 2032 James Drive, both of whom were cooperative with his investigation. Later, Ms. Stewart arrived, but Defendant never came back to the scene to speak to him. Sergeant Rivere was able to confirm Defendant's identity by Ms. Lindsey's identification of him.

Sergeant Rivere testified that he went to West Jefferson Medical Center after he learned from Ms. Stewart that Defendant was being treated for burn injuries there. When he arrived at the hospital, he spoke to Deputy Gonzales, who provided him with information as to Defendant's injuries. Defendant had already been treated for his burns. Defendant told Sergeant Rivere that he had just gotten out of the shower and was in the master bedroom when he heard a noise like glass breaking. He proceeded to the rear bedroom, and when he opened the door, it blew up. Defendant told Sergeant Rivere that it blew him off his feet and to the other side of the hallway. He got up and ran out. He then stated that his brother, Ronald, helped him get up and escorted him out. Defendant told him he went to get his mother, and they went to the hospital.

Sergeant Rivere asked Defendant if he would consent to having his clothes examined because he was a burn victim, and Defendant consented. Sergeant Rivere explained that the clothing was photographed by JPSO's crime scene technician. He explained that it was seized and photographed because he smelled an odor, and it could be evidence in the fire investigation. He explained that the possible presence of gasoline did not necessarily mean that a crime had occurred. He testified that even with the faint odor of gasoline on his clothing, Defendant was still not a suspect at this time because there was no evidence that Defendant was involved in any criminal activity. When Defendant was released from the hospital, he agreed to accompany Sergeant Rivere to the investigations bureau for

an interview. Sergeant Rivere testified that Defendant provided him with a verbal statement, and the statement was not recorded because Defendant was not a suspect at that time. He explained that part of a fire investigation was to try to find information that would help the investigators identify the origin of the fire, causation, or other potential factors. Sergeant Rivere testified that Defendant's statement was similar to what he said at the hospital.

Defendant told the detective two different versions of what happened after the fire. At the hospital, he stated that he went to his mother's place of employment, then to New Orleans to drop off Ronald, and then to the hospital. During his interview at the investigations bureau, Defendant stated that he went to New Orleans to drop off Ronald, then to his mother's place of employment, and afterwards to the hospital.

Sergeant Rivere testified that he authored a search warrant for Defendant's medical records and received a return of the records. Sergeant Rivere testified that he spoke to Ronald Howard, the other individual that was in 2034 James Drive at the time of the fire, but he did not provide any additional substantive information. Sergeant Rivere testified that samples were collected from the scene on the same evening as the fire, which included fire debris from various bedrooms.

Sergeant Rivere explained that during their investigation, he noticed that the fire debris had a peculiar odor similar to gasoline or an ignitable substance. They stopped the investigation, and he applied for a search warrant to continue the examination. More specimens were collected from bedroom three, and it was determined that the origin of the fire was bedrooms two and three. The cause was still unknown at this time, and the matter was still under investigation.[5]

---

[5] Photos taken by the Jefferson Parish Fire Department were shown to the jury. The photos included the interior of the residence. Sergeant Rivere testified with regard to a photo of the kitchen located at 2034 James Drive. He testified that they had information that the occupants typically utilized the stove as a heating source because the typical heating source did not work. The photo showed that the oven knob was at an "on" position, and the oven was opened. However, there was no fire damage to the stove that would be indicative of it being the cause of the fire.

Defendant had agreed after the first interview to return at a later date for another interview, but a date was never set. However, three weeks after the incident, he arrived at the investigations bureau unannounced. Defendant gave a statement, which was recorded.[6] Defendant was not arrested that day and was allowed to leave after providing his statement. Sergeant Rivere testified that approximately two to three weeks later, a crime lab report was published. The analysis concluded that some of the samples taken from the residence were inconclusive, some were positive for gasoline, and for some gasoline was not detected. He testified that all of the facts in evidence were re-examined along with Defendant's statements. The ultimate conclusion was that the evidence showed that this was an intentionally set fire. Gasoline was present not only on Defendant but also in, at least, one area of the home. Sergeant Rivere testified that Defendant was adamant that the explosive blast came from bedroom three, but they had no evidence in bedroom three that identified any type of explosive blast. This evidence came from bedroom two. An arrest warrant dated June 7, 2019, was prepared for Defendant's arrest for the crime of aggravated arson. Defendant was arrested in July 2019.

Sergeant Rivere testified that State Farm conducted its own investigation of the fire. He received the claim file information from State Farm, and it revealed that Ms. Stewart had made a claim. She had a State Farm policy in effect and received proceeds from that policy. Sergeant Rivere testified that at the time that State Farm conducted their investigation, the scene had already been searched during the investigation performed by JPSO. He explained that, because of the disturbance of the scene during JPSO's investigation, the possibility of any gasoline remaining was "slim to none."

---

[6] Defendant's recorded statement was played for the jury and was approximately an hour and a half long.

Marcelle Folse testified that she was a forensic chemistry supervisor at JPSO's crime laboratory.[7] She testified that when testing for ignitable liquids, there were eight possible classifications, one of which was gasoline. Nine specimens from the scene were examined, and gasoline was detected on three of them.[8]

Special Agent Sean Trimber testified that he was employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives.[9] Agent Trimber testified that he was qualified as an expert in origin and cause of fires. He explained that in this process they first determine where the fire started, and then they examine different ignition sources in the area that would cause a fire "to come together." Agent Trimber testified that he became involved in the current matter in February of 2022. He collected data from JPSO and JPFD's case files and went to the scene itself in order to render his opinion. He produced his findings and conclusions in an origin and cause report.[10] He determined that the fire started on the interior of 2034 James Drive, and the heaviest damage was in the rear. He testified that there was significant fire damage in bedrooms two and three, evidenced by significant charring of the studs. He testified that photos of electrical switches and appliances evidenced that it was not an electrical or natural gas fire. He explained that the weather conditions on the day of the fire indicated that weather did not play a role in the cause of the fire. From his analysis of witness statements, fire patterns and effects, and fire dynamics, he determined that the origin of the fire was the rear two bedrooms of 2034 James Drive.

---

[7] Ms. Folse was accepted as an expert in the field of fire debris analysis and identification of ignitable liquids.

[8] Gasoline was detected on one of Defendant's shoes (the other shoe results were inconclusive). Gasoline was also found on two separate fire debris samples from "the middle floor" of the residence.

[9] Agent Trimber was accepted as an expert in the field of fire investigation "origin and cause."

[10] Agent Trimber testified that his report was peer reviewed by two other "ATF CFIs."

As to the cause of the fire, Agent Trimber concluded that the first fuel ignited was gasoline and that there was a fuel air explosion. He explained there was a quantity of gasoline that sat, and an introduction of an open flame device to the gasoline vapors caused a "flash fire and fuel air explosion followed by a rapidly [growing] fire that within five minutes extended out the front door." He came to this conclusion from the presence of gasoline in the interior and the area of origin, the glass evidence found in the yard, and the injuries that were sustained. He testified that the evidence was not indicative of a Molotov cocktail thrown in the bedroom or another type of explosive device. He ultimately concluded that the cause was the "human act of introducing a competent ignition source to gasoline vapors in the area of origin causing a fuel air explosion that resulted in a rapid development of fire." He classified the fire as incendiary, meaning it was an intentionally set fire.[11]

Anh Dang testified that in 2018, he owned 2032/2034 James Drive and was renting out the duplex. He explained that the property was a "front and back duplex" and each one was three bedrooms and two baths. Mr. Dang testified that he was having problems with Ms. Stewart due to non-payment of rent. He explained that she was in the process of being evicted and believed she was informed by a notice. A court date had not yet been set. He was told by Ms. Lindsey that there was a fire at the residence. He testified that it was a total loss, and he was insured for the property. Mr. Dang testified that Ms. Stewart had previously called him because she was having problems with the air conditioning and gas. He testified that he fixed those issues.

Terri Stewart testified for the defense. She stated that she was Defendant's mother, and she was living at 2034 James Drive in Marrero, Louisiana on

---

[11] Agent Trimber testified that he did not watch Defendant's recorded statement as a part of his investigation because he wanted to avoid a confirmation bias.

December 12, 2018. She testified that someone called her that day and told her that her house was "set on fire." She explained that she tried to call Defendant, but he did not answer. She stated that after being unable to get in touch with Defendant, he called her before arriving to her place of employment, located on Manhattan Boulevard. He was driving her car, a 2014 Mitsubishi. She noticed that Defendant was "burnt up" and took him to West Jeff Hospital.[12] She testified that when they spoke about the fire, Defendant said there was an explosion and that someone was trying to kill them. The police spoke to Defendant at the hospital. Ms. Stewart explained that, after Defendant was released, they took him to "right off of 8th Street and Manhattan."[13] She testified that he was there an hour or two but did not remember exactly. She picked Defendant up between 11:00 p.m. and midnight. They went to the Travelodge hotel on Manhattan. She testified that, while Defendant was at the hospital, she went to her residence, and "Rivere" was there.

Ms. Stewart testified that she started living at 2034 James Drive in July of 2015.[14] She explained that she had problems with "electric," the hot water heater, and the air conditioning. She testified that Debra Lindsey lived in the front unit along with her son, daughter, and granddaughter. She explained that they got along, and that she would let Ms. Lindsey use her car and would give Ms. Lindsey rides. She testified that they started having problems over an incident at a grocery store. She distanced herself from Ms. Lindsey. They also had a problem over the parking spot, and she stated that Ms. Lindsey's daughter threatened her. Ms.

---

[12] Ms. Stewart testified that it was dark when she got to the hospital, but the State noted on cross-examination that the medical records said she arrived at 4:29 p.m. Ms. Stewart then stated she did not know what time it was when she arrived.

[13] Ms. Stewart is referring to JPSO's investigations bureau.

[14] Ms. Stewart testified that it was not accurate that Mr. Dang had previously testified that she had only lived at the residence for two months. On cross-examination, she testified that Mr. Dang never told her that she was going to be evicted and stated that she paid her rent every month.

Stewart testified that, on one occasion, she went outside to get her car, and all of her tires were flat. She called the police and made a complaint. She explained that "they" tried to come in her house through the back door, and she called the police, but nothing was done. She testified that she had a $10,000 policy with State Farm.[15] She stated that State Farm paid her the amount, but it did not cover all of the loss she had from the fire. She explained that Defendant was not living with her, but he had a bedroom in the house and would come to visit.

Defendant testified in his own defense and stated that his mother was living at 2034 James Drive on December 12, 2018. He explained that if he had a problem with his significant other, he would stay at his mother's residence. He testified that he was in the shower, and when he got out, he heard glass break. He and his brother, Ronald, met in the hallway. He went to the first room on the right, and nothing was there, and when he went to the second room on the left, it exploded.[16] He testified that he used his left hand to open the door, and when he did, it blew him back. He explained that he did not know how he and Ronald made it to the front door. Defendant testified that they ran out because he thought someone was trying to hurt them. He stated that he was "burning" but was in a state of shock. As he was leaving, he told Ms. Lindsey, "Y'all are doing too much."[17] He got in his mother's Mitsubishi, took Ronald to his sister's house in downtown New Orleans, and went to his mother's place of employment.

Defendant testified that he never talked to his mother on the phone because

---

[15] On cross-examination, the State asked Ms. Lindsey if she called State Farm before she went to the house, and she answered no. The State noted that State Farm records showed that she called to report the fire on December 12, 2018, at 4:31 p.m. The State asked her if she called State Farm later that day and if she had told them that somebody threw something through her bedroom windows. She replied that she did not say that, but she stated it was the second bedroom.

[16] Defendant testified that the room he was opening the door to when the explosion occurred was like a storage room that had boxes in it and a dining table.

[17] When asked what he meant when he stated this to Ms. Lindsey, Defendant testified, "Because like, 'You let out her tires. You burglarized the house. And now you're going to set the house on fire? Your [sic] doing too much. It's obvious.'"

his phone was at the house. He explained that he did not talk to his mother until he got to her place of employment.[18] Defendant testified that his mother left the hospital after she dropped him off to go and look at the house. He explained that he spoke to an officer who came to the hospital because there was no reason for him to hide anything. He also spoke to another officer, "Rivere." Sergeant Rivere took him to the detective bureau and they spoke for about forty minutes to an hour. Sergeant Rivere told him he was not going to hold him because he was "burnt up." Defendant was not accused of anything or arrested at this time. He testified that on January 3, 2019, he went back to the detective bureau without an appointment to speak to Sergeant Rivere. Defendant explained that he told the truth and nothing changed.[19] At the conclusion of the defense's case, the trial court instructed the jury, and it retired to deliberate.

On May 5, 2022, during jury deliberations, Defendant had a medical emergency and was brought to West Jefferson Hospital by EMS. The trial court allowed the jury to continue deliberating over the defense's objection.[20] At the conclusion of the trial, the jury returned a lesser verdict and found Defendant guilty of simple arson where the damage amounted to $500 or more, in violation of La. R.S. 14:52. The trial court ordered the jurors to be polled, and the verdict was declared legal and ordered recorded. The court ordered the jury to return on May 6, 2022, for reading of the verdict in the presence of Defendant.

On May 6, 2022, in Defendant's presence, the verdict returned the previous evening was read and declared legal and ordered recorded. The trial court noted

---

[18] On cross-examination, the State asked Defendant, "If your mom said that you called her from your cell phone and told her the house was on fire, would that be a lie?" Defendant replied, "That's a lie."

[19] On cross-examination, the State pointed out several inconsistencies in Defendant's recorded statement.

[20] The defense moved for a mistrial, which was denied. Defendant's medical emergency occurred outside of the presence of the jury.

that the jury was previously polled and ordered the polling slips to be placed under seal.[21]  A motion for new trial was filed on May 27, 2022, and was denied by the trial court on June 1, 2022.  The defense noted its objection to the court's ruling. On June 22, 2022, Defendant discharged his defense counsel, and the trial court granted counsel's motion to withdraw.  On August 4, 2022, the trial court appointed the public defender's office to represent Defendant.[22]

On November 9, 2022, the sentencing date, the defense re-urged the previously filed motion for new trial.  The trial court again denied the motion, and the defense again stated its objection.  Before the sentencing, the defense presented a brief statement.  The trial court then sentenced Defendant to five years imprisonment with the Department of Corrections.[23]  The State noted its intent to file a habitual offender bill of information.  The defense noted its objection to the sentence.  The court notified Defendant of the requirements for registration as an arson offender, and the State filed a stay away order.  The defense noted Defendant's intent to file an appeal.  The State then advised the trial court that there remained the issue of the $4,500.00 restitution owed to the victim on the bill of information.  The trial court, without a hearing, ordered the $4,500.00 restitution to be paid by Defendant.

The defense filed a motion to reconsider on November 10, 2022.  The defense then filed a motion for appeal on November 29, 2022.  On December 2, 2022, the trial court filed a payment plan schedule with the $4,500.00 restitution

---

[21] The defense again moved for a mistrial.  The trial court denied the defense's request again for the reasons it stated on the record the previous day.

[22] Public defender Miles Swanson represented Defendant.

[23] The original sentencing minute entry from November 9, 2022, was corrected by two subsequent *Nunc Pro Tunc* minute entries.  The *Nunc Pro Tunc* Minute Entry dated November 15, 2022 provided: "The original commitment dated 11/09/2022 is amended, Nunc Pro Tunc to reflect that the Court ordered the Defendant to pay Restitution in the amount of $4,500.00 to the victim, Debra Lindsey." The *Nunc Pro Tunc* Minute Entry dated January 25, 2023 provided: "The Nunc Pro Tunc commitment dated 11/15/2022 is amended, Nunc Pro Tunc to reflect that the Defendant was found guilty to a lesser charge as to Count 1 and that the Defense requested Motion for New Trial. Motion denied by the Court."

amount.  A hearing on the motion to reconsider sentence was held on January 25, 2023.  The defense informed the trial court that it previously filed an objection to the habitual offender bill and that the State would not be filing one.  The State agreed that it would not be filing a habitual offender bill.  The trial court noted that the "multiple bill issue" and the "motion relative to quashing of the multiple bill" were moot.  The defense moved for its motion to reconsider, and the State objected.  The court denied the motion to reconsider, and the defense noted its objection.  The court granted the defense's motion for appeal.  After granting Defendant's motion for appeal, the trial court moved on to the "motion relative to restitution"[24] and asked the defense what Defendant's position was.  Defense counsel was placed in a breakout room with Defendant.  Upon their return, the defense stated that Defendant would like to have a restitution hearing.  The trial court thereafter set the matter for a hearing.

On March 1, 2023, and March 15, 2023, the trial court conducted a restitution hearing, during which Debra Lindsey testified.  Arguments were heard, and the trial court ordered restitution to be paid in the amount of $3,800.00.  The trial court noted the defense's objection.  The instant appeal followed.

## ASSIGNMENT OF ERROR

On appeal, Defendant alleges that the trial court erred in imposing a prison sentence and ordering him to pay restitution to the victim.

## LAW AND ANALYSIS[25]

Imposition of Second Sentence

In this matter, the trial court imposed restitution as a part of Defendant's

---

[24] The record does not contain a motion regarding restitution.

[25] The sufficiency of the evidence for Defendant's conviction of simple arson where the damage amounted to $500 or more, in violation of La. R.S. 14:52, was considered by this Court, as required by *State v. Raymo*, 419 So.2d 858 (La. 1982) and *State v. Hearold*, 603 So.2d 731 (La. 1992).  We find that the State offered sufficient evidence at trial to establish all of the elements of the crime of which Defendant was accused.  Therefore, we hold that Defendant is not entitled to an acquittal under *Hudson v.*

sentence in the amount of $4,500.00 on November 9, 2022. Thereafter, a motion to reconsider sentence[26] was filed by the defense on November 10, 2022, and a motion for appeal was filed on November 29, 2022. A hearing was held on January 25, 2023. The court denied the defense's motion to reconsider, and the defense noted its objection.[27] The court then granted the defense's motion for appeal. However, after granting Defendant's motion for appeal, the court held a restitution hearing on March 1, 2023 and March 15, 2023. On March 15, 2023, at the conclusion of the restitution hearing, the trial court ordered a new restitution amount to be paid in the amount of $3,800.[28] The record provides no evidence that the restitution imposed on November 9, 2022 was vacated by the court.

The first issue we will consider is whether the trial court was divested of jurisdiction when it ordered the second amount of restitution in the reduced amount of $3,800 on March 15, 2023. La. C.Cr.P. art. 916 provides:

> The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. Thereafter, the trial court has no jurisdiction to take any action except as otherwise provided by law and to:
>
> (1) Extend the return day of the appeal, the time for filing assignments of error, or the time for filing per curiam comments in accordance with Articles 844 and 919.
> (2) Correct an error or deficiency in the record.
> (3) Correct an illegal sentence or take other appropriate action pursuant to a properly made or filed motion to reconsider sentence.
> (4) Take all action concerning bail permitted by Title VIII.
> (5) Furnish per curiam comments.
> (6) Render an interlocutory order or a definitive judgment concerning a ministerial matter not in controversy on appeal.

---

*Louisiana*, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). *See also*, *State v. McClure*, 14-253 (La. App. 5 Cir. 3/11/15), 169 So.3d 510, 520 n. 17.

[26] In the motion to reconsider, the defense argued that, pursuant to La. C.Cr.P. art. 881.1, and in considering Defendant's "poor health condition," the sentence was excessive and should be reconsidered.

[27] Although the trial judge initially ordered restitution on November 9, 2022 as part of Defendant's sentence, the January 25, 2023 transcript reflects that the trial judge treated the restitution as a separate matter apart from his review of Defendant's sentence at issue in the motion to reconsider sentence. However, La. C.Cr.P. art 883.2(A), *infra*, instructs that restitution shall be considered a part of a defendant's sentence.

[28] The victim produced receipts that totaled $3,800.

(7) Impose the penalty provided by Article 844.

(8) Sentence the defendant pursuant to a conviction under the Habitual Offender Law as set forth in R.S. 15:529.1.

The trial court granted Defendant's motion for appeal on January 25, 2023, after sentencing Defendant to five years imprisonment and ordering him to pay $4,500 in restitution on November 9, 2022.[29] We find that the second order of restitution issued by the court on March 15, 2023, in the amount of $3,800, is a nullity because the trial court was divested of jurisdiction at that point. *See State v. Granger*, 08-1478 (La. App. 3 Cir. 6/3/09), 11 So.3d 1215, 1222, where the Third Circuit vacated the trial court's order of restitution, when the trial court sentenced the defendant without restitution, denied the motion to reconsider sentence, granted the motion for appeal, then issued an order of restitution. The Third Circuit found the trial court was divested of jurisdiction, and the judgment was therefore a nullity. *See also* La. C.Cr.P. art. 881, which states, "Although the sentence imposed is legal in every respect, the court may amend or change the sentence, within the legal limits of its discretion, prior to the beginning of execution of the sentence."

Accordingly, we find that the sentence imposed on November 9, 2022 is the only valid sentence before us for review. Upon review of the November 9, 2022 sentence, we find that an errors patent review requires the sentence to be vacated, and the matter be remanded to the trial court for resentencing as set forth below.

Errors Patent Review

The record was reviewed for errors patent according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5th Cir. 1990). The following error was found on review.

On November 9, 2022, Defendant was sentenced to five years imprisonment

---

[29] In the instant matter, restitution was ordered as a part of the sentence, as authorized by La. C.Cr.P. art. 883.2

with the Department of Corrections for the conviction of simple arson where the damage amounted to $500 or more, in violation of La. R.S. 14:52. The State then notified the trial court about restitution in the matter, stating, "there is restitution in this matter of forty-five hundred dollars…owed to the victim on the bill of information." The trial court stated, "All right. And the Court will order the forty-five hundred dollars restitution [sic] be paid by the defendant."[30]

Although the State indicated that $4,500 was owed to Debra Lindsey, a review of the record reflects that no evidence was introduced as to the actual pecuniary loss to the victim before the issuance of the November 9, 2022 restitution order.[31]

In *State v. Douglas*, 22-752 (La. App. 3 Cir. 2/23/23), 358 So.3d 580, 584, the third circuit found that there were errors patent involving the trial court's restitution order. The errors patent were argued under the assigned error by the defendant, and therefore, the court addressed it as such. The defendant argued that the trial court erred in ordering that the restitution be paid to the victim's minor children.[32] One of the defendant's arguments was that if the victim's minor children could be considered victims for purposes of restitution, the trial court erred in failing to determine the actual pecuniary loss suffered by the minor children. *Id.* at 591. The trial court ordered the defendant to pay $25,000 to the victim's minor children. The defendant argued that the court speculated as to the amount of restitution and that no actual pecuniary loss to a victim was established

---

[30] Although the trial court did not specifically state who the restitution was payable to, in ordering Defendant to pay restitution in the amount of $4,500, the court was responding to the State's earlier statement that it was "owed to the victim on the bill of information." The only victim listed on the bill of information was Debra Lindsey.

The *nunc pro tunc* sentencing minute entry on January 1, 2023, indicates: "The court ordered the Defendant to pay Restitution in the amount of $4,500.00 to the victim, Debra Lindsey."

[31] Pecuniary loss to Debra Lindsey was not presented by the State at trial.

[32] The defendant pleaded guilty to one count of obstruction of justice. Restitution was issued as a part of the defendant's sentence after he pled guilty. *Douglas*, 358 So.3d at 583-84.

as required by La. C.Cr.P. art. 883.2.[33] *Id.* at 592. While the appellate court found

no error in the trial court's order to pay restitution to the victim's minor children, it

found that the record was insufficient to support the amount ordered. The court

explained that no specific evidence was introduced as to the children's actual

pecuniary loss at the defendant's sentencing hearing. *Id.*

In reviewing jurisprudence regarding restitution ordered under La. C.Cr.P.

arts. 883.2 and 895.1 (where restitution is ordered as a condition of probation),[34]

the *Douglas* court stated:

> Although the above cases involved restitution ordered as a condition
> of probation, this distinction does not merit a different result for
> restitution ordered pursuant to La. Code Crim.P. art. 883.2. When
> restitution is ordered under either article, the record must be sufficient
> to review the restitution ordered. Accordingly, we grant the
> defendant's request for a restitution hearing by instructing the trial
> court to hold such hearing upon remand.

*Douglas*, 358 So.3d at 593.

The *Douglas* court ultimately remanded the case for a restitution hearing with

instructions that the hearing also comply with La. C.Cr.P. art. 875.1. *Douglas*, 358

So.3d at 596.

La. C.Cr.P. art. 875.1 provides, in pertinent part:

A. The purpose of imposing financial obligations on an offender who is

---

[33] La. C.Cr.P. art. 883.2 provides, in pertinent part:

A. In all cases in which the court finds an actual pecuniary loss to a victim, or in any case where the court finds that costs have been incurred by the victim in connection with a criminal prosecution, the trial court shall order the defendant to provide restitution to the victim as a part of any sentence that the court shall impose.

[34] La. C.Cr.P. art. 895.1(a)(1) states:

A. (1) When a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense. The court shall order restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain. However, any additional or other damages sought by the victim and available under the law shall be pursued in an action separate from the establishment of the restitution order as a civil money judgment provided for in Subparagraph (2) of this Paragraph. If the court has determined, pursuant to the provisions of Article 875.1, that payment in full of the aggregate amount of all financial obligations imposed upon the defendant would cause substantial financial hardship to the defendant or his dependents, restitution payments shall be made pursuant to the provisions of Article 875.1.

convicted of a criminal offense is to hold the offender accountable for his action, to compensate victims for any actual pecuniary loss or costs incurred in connection with a criminal prosecution, to defray the cost of court operations, and to provide services to offenders and victims. These financial obligations should not create a barrier to the offender's successful rehabilitation and reentry into society. Financial obligations in excess of what an offender can reasonably pay undermine the primary purpose of the justice system which is to deter criminal behavior and encourage compliance with the law. Financial obligations that cause undue hardship on the offender should be waived, modified, or forgiven. Creating a payment plan for the offender that is based upon the ability to pay, results in financial obligations that the offender is able to comply with and often results in more money collected. Offenders who are consistent in their payments and in good faith try to fulfill their obligations should be rewarded for their efforts.

B. For the purposes of this Article, "financial obligations" shall include any fine, fee, cost, restitution, or other monetary obligation authorized by this Code or by the Louisiana Revised Statutes of 1950 and imposed upon the defendant as part of a criminal sentence, incarceration, or as a condition of the defendant's release on probation or parole.

C. (1) Notwithstanding any provision of law to the contrary, ***prior to ordering the imposition or enforcement of any financial obligations as defined by this Article, the court shall conduct a hearing to determine whether payment in full of the aggregate amount of all the financial obligations to be imposed upon the defendant would cause substantial financial hardship to the defendant or his dependents.*** The court may consider, among other factors, whether any victim of the crime has incurred a substantial financial hardship as a result of the criminal act or acts and whether the defendant is employed. The court may delay the hearing to determine substantial financial hardship for a period not to exceed ninety days, in order to permit either party to submit relevant evidence.

(2) The defendant or the court may waive the judicial determination of a substantial financial hardship required by the provisions of this Paragraph. If the court waives the hearing on its own motion, the court shall provide reasons, entered upon the record, for its determination that the defendant is capable of paying the fines, fees, and penalties imposed without causing a substantial financial hardship.

D. (1) If the court determines that payment in full of the aggregate amount of all financial obligations imposed upon the defendant would cause substantial financial hardship to the defendant or his dependents, the court shall do either of the following:
(a) Waive all or any portion of the financial obligations, except as provided in Paragraph E of this Article.
(b) Order a payment plan that requires the defendant to make a monthly payment to fulfill the financial obligations.

(2)(a) The amount of each monthly payment for the payment plan ordered pursuant to the provision of Subsubparagraph (1)(b) of this Paragraph shall be determined by the court after considering all relevant factors, including but not limited to the defendant's average gross daily income for an eight-hour work day.
(b) If the court has ordered restitution, half of the defendant's monthly payment shall be distributed toward the defendant's restitution obligation.
(c) Except as provided in Paragraph E of this Article, during any periods of unemployment, homelessness, or other circumstances in which the defendant is unable to make the monthly payment, the court or the defendant's probation and parole officer is authorized to impose a payment alternative, including but not limited to substance abuse treatment, education, job training, or community service.

(Emphasis added).

After review, we find that the record does not contain sufficient evidence to support the amount of restitution ordered. The trial court in this matter imposed restitution in the amount of $4,500 without the introduction of any evidence of the amount of the victim's loss or Defendant's ability to pay the amount ordered, as required by La. C.Cr.P. art. 875.1. Accordingly, like the court in *Douglas*, *supra*, we vacate Defendant's sentence and remand the matter to the trial court for a restitution hearing to be held. The trial court is instructed to hold a hearing that fully complies with La. C.Cr.P. art. 875.1.

**DECREE**

For the foregoing reasons, Defendant's conviction is affirmed, and his sentence is vacated. The matter is remanded to the trial court for a restitution hearing to allow the parties to present evidence concerning the amount of restitution owed and resentencing.

**CONVICTION AFFIRMED;
SENTENCE VACATED;
REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 27, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

**23-KA-234**

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. LEE V. FAULKNER, JR. (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          LIEU T. VO CLARK (APPELLANT)

### MAILED
BRITTANY BECKNER (APPELLEE)
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053